UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ANNE KEARNEY, ) ) ) Plaintiff, ) ) v. ) ) ) CENTRUS PREMIER HOME CARE, INC., ) ) Defendant. ) ) ) ) | Civil Action No. 14-10073-DJC |

MEMORANDUM AND ORDER

CASPER, J.                                                                                                       November 5, 2015

I.   Introduction

Plaintiff Anne Kearney ("Kearney") alleges that Defendant Centrus Premier Home Care, Inc. ("Centrus") interfered with her rights under the Family Medical Leave Act ("FMLA"), 26 U.S.C. § 2601 *et seq.*, and unlawfully retaliated against her for taking FMLA leave. D. 17. She also asserts two state law claims, wrongful termination in violation of public policy and negligent infliction of emotional distress. Id. Centrus now moves for summary judgment. D. 30. For the reasons below, the Court ALLOWS Centrus's summary judgment motion.

II.  Standard of Review

The Court grants summary judgment where there is no genuine dispute on any material fact and the undisputed facts demonstrate that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "A fact is material if it carries with it the potential to affect the outcome of the suit under the applicable law." Santiago–Ramos v. Centennial P.R. Wireless

Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)).  The movant bears the burden of demonstrating the absence of a genuine issue of material fact.  Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000); see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  If the movant meets its burden, the non-moving party may not rest on the allegations or denials in his pleadings, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986), but "must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." Borges ex rel. S.M.B.W. v. Serrano–Isern, 605 F.3d 1, 5 (1st Cir. 2010).  The Court "view[s] the record in the light most favorable to the nonmovant, drawing reasonable inferences" in her favor.  Noonan v. Staples, Inc., 556 F.3d 20, 25 (1st Cir. 2009).  Nevertheless, "[c]onclusory allegations, improbable inferences, and unsupported speculation are insufficient to establish a genuine dispute of fact."  Velázquez-Pérez v. Developers Diversified Realty Corp., 753 F.3d 265, 270 (1st Cir. 2014).

**III.    Factual Background**

Unless otherwise noted, the following facts are undisputed and drawn from Centrus's statement of material facts, D. 32, and Kearney's response to Centrus's statement of material facts, D. 42.

**A.    Centrus Grants Kearney FMLA Leave**

Centrus is a Massachusetts-based home healthcare company.  D. 32 ¶ 1; D. 42 ¶ 1. Around September 2004, Centrus hired Kearney to work out of its Plymouth branch office.  D. 32 ¶ 2; D. 42 ¶ 2.  Throughout her time with Centrus, Kearney was a registered nurse.  D. 32 ¶ 5; D. 42 ¶ 5.  As part of her job, Kearney traveled to patients' homes to provide medical care.  D. 32 ¶ 2; D. 42 ¶ 2.

Kearney was overseen by a Centrus case manager.  D. 32 ¶ 3; D. 42 ¶ 3.  From July 2012 until her termination, her case manager was Barbara Briggs ("Briggs").  D. 32 ¶ 3; D. 42 ¶ 3.  Briggs in turn reported to Sandra Cadieux ("Cadieux"), the Director of Nursing for the Plymouth branch.  D. 32 ¶ 3; D. 42 ¶ 3.

Kearney's employment contract states that Centrus "will attempt to give the employee the hours and shifts they desire," but "[a]s a temporary nursing service [Centrus] cannot guarantee employment, due to the changing needs of our clients."  D. 33-5 at 31.  From 2004 to 2006, Kearney provided care to three or four Centrus clients.  D. 32 ¶ 5; D. 33-3 (Kearney's Dep.) at 11.  From 2006 to May 2012, Kearney cared for one client, J.D.  D. 32 ¶ 5; D. 33-3 at 12.  In May 2012, Kearney requested and received FMLA leave because of a bruised hip.  D. 32 ¶ 30; D. 42 ¶ 30.

### B.     Kearney Works with a New Patient upon Returning from Leave

When Kearney was on leave, Centrus assigned another nurse to care for J.D.  D. 32 ¶ 34; D. 42 ¶ 34.  J.D. requested that the temporary arrangement be made permanent because he preferred the new nurse.  D. 32 ¶ 34; D. 42 ¶ 34.  Centrus honored J.D.'s request and told Kearney that she would need to meet new potential clients and it would try to match her with patients who would provide her the same number of hours as J.D did.  D. 32 ¶ 36; D. 42 ¶ 36.  As a result, Kearney returned to Centrus approximately two weeks later than scheduled.  D. 33-3 at 23-24; D. 41 at 12; D. 50 at 6.

Kearney met with two clients and Centrus allowed her to choose either one.  D. 32 ¶ 40; D. 42 ¶ 40.  Kearney chose G.N. based on G.N.'s location and the number of projected hours.  D. 32 ¶ 40; D. 42 ¶ 40.  G.N. was a homebound pediatric patient who suffered from spastic diplegia and lived with her mother.  D. 32 ¶ 6; D. 42 ¶ 6.

3

During her time with Centrus, both before and after taking leave, Kearney remained eligible for Centrus's employee health insurance as long as she was paid for at least thirty hours a week. D. 32 ¶ 31; D. 42 ¶ 31. Although Kearney did not always work at least thirty hours a week while caring for J.D., she had accrued enough paid time off to meet the threshold for health insurance when she otherwise fell short. D. 32 ¶ 32; D. 42 ¶ 32. During her FMLA leave, however, Kearney exhausted her paid time off. D. 32 ¶ 33; D. 42 ¶ 33. That meant upon her return, Kearney could no longer supplement her weekly hours with paid leave to stay eligible for health insurance. D. 32 ¶ 33; D. 42 ¶ 33.

### C. Kearney Raises an Issue Regarding Patient Privacy

Centrus required its nurses to record their patients' vital signs and other details of their patient's conditions on nursing flow sheets. D. 32 ¶ 7; D. 42 ¶ 7. Nurses obtained blank flow sheets at their branch offices or had them mailed to patients' homes. D. 32 ¶ 9; D. 42 ¶ 9.

Previously, Centrus nurses recorded their time on timecards which did not contain patient information. D. 32 ¶ 43; D. 42 ¶ 43. Around May 2011, Centrus changed its policy and had their nurses record their arrival and departure times on their patients' flow sheets. D. 32 ¶¶ 7, 43; D. 42 ¶¶ 7, 43. Nurses were required to return their flow sheets to their branch office by mail, fax or hand to ensure accurate patient tracking and timely processing of payroll. D. 32 ¶ 8; D. 42 ¶ 8.

Kearney worried that Centrus's new policy violated the Health Insurance Portability and Accountability Act ("HIPAA") because the faxes to payroll could expose a patient's health information to those unauthorized to view it. D. 32 ¶ 44; D. 42 ¶ 44. Around May 2011, Kearney emailed Josh Bellus, her branch office's account manager about her concern. D. 32 ¶

45; D. 42 ¶ 45.  Kearney also emailed Cadieux and raised her concern with the case manager before Briggs.  D. 32 ¶ 45; D. 42 ¶ 45; D. 45-1 at 29-30.

### D.     Centrus Finds Issues with Kearney's Flow Sheets

Centrus asserts that nurses were never permitted to verify their own hours.  D. 32 ¶¶ 10-11.  Instead, the patient, the patient's primary caregiver or any incoming nurse was required to sign the departing nurse's flow sheet to confirm that the reported hours were accurate.  Id. ¶ 10.  Kearney agrees that the signature policy was to ensure accurate hours, but insists that the policy was more flexible.  D. 42 ¶ 10.  She contends that Centrus required a signature from the patient, the patient's primary caregiver or the incoming nurse only when one of them was available.  Id.  Otherwise, Centrus nurses were permitted to verify their own hours.  Id.

In 2012, Briggs noticed that four flow sheets that Kearney submitted for care provided to G.N. on September 3, 4, 5 and 7, 2012 had J.D.'s name pre-stamped on the signature line meant for verifying Kearney's hours.  D. 32 ¶ 12; D. 42 ¶ 12.  J.D., Kearney's previous patient, was a disabled quadriplegic who lived alone and had a stamp that displayed his full name and served as his signature.  D. 32 ¶ 13; D. 42 ¶ 13.

On these four flow sheets, J.D.'s name had been crossed out with either G.N.'s last name or her mother's initials written near or above J.D's name.  D. 32 ¶ 14; D. 42 ¶ 14.  Kearney's initials were also nearby and circled.  D. 32 ¶¶ 14, 18; D. 42 ¶¶ 14, 18.  In addition to J.D.'s stamp, the September 7th flow sheet included J.D.'s full name and his medical record number at the top of the page, both crossed out and with G.N.'s full name and medical record number written above them.  D. 32 ¶ 15; D. 42 ¶ 15.

Kearney and Centrus dispute whether J.D's information on these sheets is still legible. D. 32 ¶¶ 14-15; D. 42 ¶¶ 14-15. Both agree, however, that neither J.D. nor Centrus authorized Kearney to pre-stamp flow sheets with J.D.'s name. D. 32 ¶ 17; D. 42 ¶ 17.

After discovering this issue, Briggs informed Cadieux. D. 32 ¶ 19; D. 42 ¶ 19. On September 17, 2012, in accordance with Centrus policy, Cadieux submitted a form to Centrus's compliance department. D. 32 ¶ 19; D. 42 ¶ 19; D. 33-5 at 13-14. Centrus suspended Kearney during the compliance department's investigation. D. 32 ¶ 20; D. 42 ¶ 20.

In an interview for the investigation, Kearney admitted that she used pre-filled flow sheets with J.D.'s name to record care she provided to G.N. D. 32 ¶¶ 16, 21; D. 42 ¶¶ 16, 21. She stated she used pre-filled flow sheets because she had no more blank sheets to use. D. 32 ¶¶ 16, 21; D. 42 ¶¶ 16, 21. Kearney also admitted that she had verified her own hours by signing on GN's mother's behalf. D. 32 ¶¶ 22-23; D. 42 ¶¶ 22-23. The parties, however, dispute whether G.N.'s mother ever gave Kearney permission to do so. D. 32 ¶¶ 22-23; D. 42 ¶¶ 22-23. Cadieux issued Kearney a written warning, which the compliance department had recommended. D. 32 ¶ 24; D. 42 ¶ 24.

During Kearney's suspension, G.N.'s mother informed Briggs that on September 7, 2012—a day for which Kearney verified her own hours—Kearney did not arrive to start her shift until 5:45 p.m., 2 hours and 45 minutes past her scheduled start time of 3:00 p.m. D. 32 ¶ 25; D. 42 ¶ 25; D. 46-6. On the flow sheet, Kearney wrote that she began her shift at 4:30 p.m. D. 32 ¶ 25; D. 42 ¶ 25; D 46-4 at 9. Kearney denies that she arrived after 4:30 p.m. D. 42 ¶ 25.

Based on this new allegation, on September 24, 2012, Cadieux submitted another form to the compliance department. D. 32 ¶ 26; D. 42 ¶ 26; D. 46-6. In a call with the compliance department, Kearny denied that she had misreported her hours and accused G.N.'s mother and a

non-Centrus nurse of conspiring against her to increase the other nurse's hours.  D. 32 ¶ 27; D. 42 ¶ 27.  On October 9, 2012, Centrus terminated Kearney.  D. 32 ¶ 29; D. 42 ¶ 29; D. 46-9.  The official form stated that Centrus fired her for violating company policy and for fraud.  D. 46-9.

## IV.   Procedural History

In November 2013, Kearney filed this lawsuit in Plymouth Superior Court.  D. 1 at 1.  In January 2014, Centrus removed the lawsuit to federal court.  D. 1.  In June 2014, Kearney filed an amended complaint, which remains the operative complaint.  D. 17.  Centrus has now filed for summary judgment on all of Kearney's claims:  (1) unlawful interference under FMLA, (2) retaliation under FMLA, (3) wrongful termination in violation of public policy and (4) negligent infliction of emotional distress.  D. 30.  As of the motion hearing, Kearney agreed that the latter two claims should be dismissed with prejudice.  D. 53.  Accordingly, the Court addresses the only remaining claims:  interference and retaliation, Counts I and II, respectively.  After the October 1, 2015 motion hearing, the Court took the matter under advisement.  Id.

## V.   Discussion

### A.   Unlawful Interference under FMLA

FMLA provides eligible employees up to twelve weeks of unpaid leave during any twelve-month period for a serious health condition.  Bellone v. Southwick-Tolland Reg'l Sch. Dist., 748 F.3d 418, 422 (1st Cir. 2014) (citing 29 U.S.C. § 2612(a)(1)(D)).  Once an eligible employee returns from leave, she "is entitled to return to the same position or an alternate position with equivalent pay, benefits, and working conditions, and without loss of accrued seniority."  Hodgens v. Gen. Dynamics Corp., 144 F.3d 151, 159 (1st Cir. 1998).  An employer violates FMLA if it refuses to restore an eligible employee to the same or equivalent

employment upon her return.  Hillstrom v. Best W. TLC Hotel, 265 F. Supp. 2d 117, 126 (D. Mass. 2003), aff'd, 354 F.3d 27 (1st Cir. 2003).

Here, Centrus and Kearney agree that both before and after her leave, Kearney was a registered nurse.  D. 32 ¶ 5; D. 42 ¶ 5.  They also agree that she enjoyed the same pay rate: $28 to $33 an hour (depending on the type of shift).  D. 32 ¶ 31; D. 42 ¶ 31.  They further agree that she had the same benefits eligibility requirement:  benefits were available if she worked and was paid for thirty hours a week.  D. 32 ¶ 31; D. 42 ¶ 31.  Centrus thus returned Kearney to the same job and this undisputed fact extinguishes Kearney's claim.  Szabo v. Tr. of Boston Univ., No. 96-cv-10806-GAO, 1998 WL 151272, at *6 (D. Mass. Mar. 18, 1998) (granting summary judgment on FMLA claim in part because the plaintiff "returned to work at the same position and salary as when she left"), aff'd, 181 F.3d 80 (1st Cir. 1998) (table).

Kearney argues that Centrus failed to restore her to the same position because she lost health insurance when she returned.  D. 41 at 11.  The undisputed record, however, demonstrates that she did not lose her health insurance because Centrus gave her a different position.  Instead, Kearney lost her health insurance because she had exhausted her paid leave, which had previously allowed her to meet the thirty-hour threshold when her weekly hours fell short.  D. 32 ¶¶ 32-33; D. 42 ¶¶ 32-33.  Kearney fails to point to anything in the record to show that any action by Centrus depleted her reserve of paid leave.  Cf. 29 C.F.R. § 825.215(d)(5) (stating that employees on unpaid FMLA leave are entitled to changes in benefits plans, "except those which may be dependent upon seniority or accrual during the leave period" and "[f]or example, if the benefit plan is predicated on a pre-established number of hours worked each year and the employee does not have sufficient hours as a result of taking unpaid FMLA leave, the benefit is lost").

Kearney also argues that the two-week delay in her start date suggests that Centrus did not restore her to the same position and that this delay artificially inflates her post-leave hours so they appear equivalent to her pre-leave hours. D. 41 at 12. The undisputed record, however, shows that Centrus did not cause the two-week delay. Kearney could not start immediately because J.D., her only patient at the time, asked to discontinue her as his nurse and Centrus needed to find another patient for Kearney. D. 32 ¶¶ 34, 36; D. 42 ¶¶ 34, 36.

In any event, even if Kearney had continued to work with J.D. after returning from leave, nothing in the record shows that she would have qualified for health insurance but for the two-week delay. In fact, Kearney often missed the thirty-hour threshold while caring for J.D. D. 32 ¶ 32; D. 42 ¶ 32; D. 33-5 at 33-34 (Kearney's schedule showing that in the eight weeks leading up to her leave, Kearney missed the threshold every week but one). Based on this record, the Court concludes that no rational factfinder can reasonably find that Centrus failed to restore Kearney to the same position.[1]

### B.      Retaliation under FMLA

To establish a claim of FMLA retaliation, an employee must show that: (1) "she availed herself of a protected FMLA right," (2) "she was adversely affected by an employment decision," and (3) "a causal connection between [her] protected conduct and the adverse employment action" exists. Carrero-Ojeda v. Autoridad de Energía Eléctrica, 755 F.3d 711, 719

---

[1] Kearney argues that two Centrus employees promised her that she would remain a "benefitted employee," i.e., she would remain a nurse, who upon reaching thirty hours, would receive health care benefits. D. 41 at 5; D. 50 at 6 n.3. Kearney understood their promise to be that she would be guaranteed thirty hours a week. D. 41 at 5. Although the record suggests that at least one employee never made this promise and lacked the authority to do so, D. 50 at 4-6 & n. 2-3, if this is a disputed issue of fact, it is immaterial. Under her employment agreement, Centrus never guaranteed her hours, nor did she always work thirty hours before her leave. Thus, any alleged failure to deliver on that promise was not unlawful interference because a thirty-hour minimum was never a condition of her employment in the first place.

9

(1st Cir. 2014) (citing Orta-Castro v. Merck, Sharp & Dohme Química P.R., Inc., 447 F.3d 105, 107 (1st Cir. 2006)).  Where direct evidence of retaliation does not exist, courts apply the three-step framework in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), used in Title VII and other civil rights cases.  Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 335-36 (1st Cir. 2005).

Under that framework, the employee carries the initial burden to establish a *prima facie* case of retaliation.  Id. (citing Hodgens, 244 F.3d at 160).  Once a *prima facie* case is established, "the burden shifts to the employer to articulate some legitimate, nondiscriminatory reason for the termination."  Id. (citing Hodgens, 244 F.3d at 160) (internal quotation marks omitted).  If the employer's evidence creates a genuine issue of material fact, "the presumption of discrimination drops from the case, and the plaintiff retains the ultimate burden of showing that the employer's stated reason for terminating [her] was in fact a pretext" for retaliation for taking FMLA leave.  Id. (citing Hodgens, 244 F.3d at 161).  The first two elements are not in dispute here:  in 2012, Kearney took FMLA leave from May to July and Centrus terminated her in October.  Summary judgment here turns upon whether a reasonable factfinder could infer a causal connection between her leave and her termination and whether Centrus's stated reasons are pretextual.

Kearney argues that a factfinder can infer a causal connection because Centrus fired her in October 2012, shortly after she returned from leave.  D. 41 at 15-16.  Yet "[c]hronological proximity does not by itself establish causality, particularly if '[t]he larger picture undercuts any claim of causation.'"  Ramírez Rodríguez v. Boehringer Ingelheim Pharm., Inc., 425 F.3d 67, 85 (1st Cir. 2005) (citation omitted); Ahern v. Shinseki, 629 F.3d 49, 58 (1st Cir. 2010) (affirming summary judgment in a Title VII retaliation case on failure to establish causation because "[w]ithout some corroborating evidence suggestive of causation—and there is none here—a gap

of several months cannot alone ground an inference of a causal connection between a complaint and an allegedly retaliatory action"). Where the adverse conduct also closely follows the employer's stated justification, temporal proximity "weighs as strongly for [the] asserted legitimate reason as it does for pretext." Brookins v. Staples Contract & Commercial, Inc., No. 11-cv-11067-RWZ, 2013 WL 500874, at *6 (D. Mass. Feb. 12, 2013). Centrus terminated Kearney three months after she returned from leave, but within a month of learning that Kearney may have violated company policy by using pre-stamped flow sheets and by padding and verifying her own hours. At best, the temporal proximity here cuts both ways.

Even if the Court assumes that Kearney can establish causation, Kearney has not presented evidence from which a reasonable jury could infer that Centrus fired her because she took FMLA leave. Hodgens, 144 F.3d at 168 (noting that for pretext, the key question is whether "a reasonable jury [could] find that the adverse action was taken because of the employee's protected conduct rather than because of other nondiscriminatory reasons"). The compliance department recommended a written warning for Kearney's use of pre-filled flow sheets and Centrus issued that warning and suspended her during its investigation. D. 32 ¶¶ 20, 24; D. 42 ¶¶ 20, 24; D. 33-5 at 16-19. On the same day Centrus issued the written warning and suspension, a new related issue arose: whether Kearney defrauded Centrus on one of the flow sheets at issue by inflating her hours and verifying them herself. D. 32 ¶¶ 25-26; D. 42 ¶¶ 25-26; D. 33-5 at 16-17, 21-22. Centrus terminated her approximately two weeks later. D. 33-5 at 27.

"In assessing pretext, a court's 'focus must be on the perception of the decisionmaker,' that is, whether the employer believed its stated reason to be credible." Mesnick v. Gen. Elec. Co., 950 F.2d 816, 824 (1st Cir. 1991) (quoting Gray v. New England Tel. and Tel. Co., 792 F.2d 251, 256 (1st Cir. 1986)). To survive summary judgment, a plaintiff "must show that the

decisionmaker did not believe in the accuracy of the reason given." Henry v. United Bank, 686 F.3d 50, 58 (1st Cir. 2012) (quoting Bennett v. Saint-Gobain Corp., 507 F.3d 23, 31 (1st Cir. 2007)). Thus, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive.'" Mesnick, 950 F.2d at 824 (citing Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 9 (1st Cir. 1990)).

Kearney argues that Centrus's reasons for terminating her are pretextual because the company's compliance department did not recommend termination over the pre-filled sheets. D. 41 at 16-17. Yet by the end of the process, Kearney was under scrutiny for more than the pre-filled sheets. Comparing the final result to an interim recommendation for a less serious charge does not raise a factual dispute over pretext.

Kearney also argues that her termination was pretextual because the compliance department did not find the fraud charge substantiated, as Kearney denied G.N.'s allegations that she had arrived late. Id. at 16-18. But "where the company undertook a reasonable investigation, heard [her] side of the story, and decided that [her] accuser's was more credible," a plaintiff's "denial of wrongdoing is not enough to raise an inference of pretext." Azimi v. Jordan's Meats, Inc., 456 F.3d 228, 246 (1st Cir. 2006). Pretext does not exist because Kearney disputes Centrus's reason for firing her. "Courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employers' nondiscriminatory business decisions." Mesnick, 950 F.2d at 825. Here, Centrus concluded that Kearney's actions were "'serious enough' to result in termination, rather than a lesser sanction." Ramírez Rodríguez, 425 F.3d at 85. A Centrus corporate representative testified that the leadership (executives above

12

Cadieux) made the ultimate decision to terminate Kearney because in this situation, they decided to believe G.N.'s mother. D. 50-1 at 9-10. "It is not [the Court's] role to second-guess the merits of that conclusion." Ramírez Rodríguez, 425 F.3d at 81.

Finally, Kearney suggests that Centrus fired her because it was "unwilling[] to accommodate her return." D. 41 at 16. This argument fails too. Centrus did accommodate her return because it restored her to the same job. See Brookins, 2013 WL 500874, at *7 (stating that an employer's "willingness to provide [the plaintiff] with FMLA leave is hard to reconcile with the asserted retaliation" that the plaintiff was fired for requesting it).

In sum, Kearney's retaliation claim fails because she offers no facts to show that her leave played a role in her firing or that Centrus's decision was anything other than a good faith belief that she violated company policies. "There is no statement by any decisionmaker evidencing retaliatory motive" or a statement linking her firing to her leave. Colburn, 429 F.3d 325, 338 (1st Cir. 2005). Because "tenuous insinuations on the facts surrounding her termination and [a defendant's] reason for taking that action" do not create a triable issue on retaliatory animus, Henry, 686 F.3d at 58, the Court concludes no jury could reasonably conclude that Centrus fired Kearney because she took FMLA leave.

## VI. Conclusion

For the foregoing reasons, the Court ALLOWS Defendants' motion for summary judgment, D. 30.

**So Ordered.**

                                                   /s/ Denise J. Casper
                                                   United States District Judge